UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> CRISTIAN HUMBERTO CASTRO DIAZ, <br><br> Defendant. | 5:18-CR-50069-JLV <br><br> AMENDED <br> REPORT AND RECOMMENDATION <br> REGARDING MOTION TO <br> SUPPRESS (DOC. 95) |

Pending is Defendant's Motion to Suppress Evidence and Statements. (Doc. 95).  A hearing was held on Tuesday, March 19, 2019.  Defendant was personally present and represented by his attorney of record, Johnathon P. McCoy.  Also present to assist the Defendant with translation were live interpreters, David Lauman and Rosabelle Rice.  The Government was represented by the Assistant United States Attorney, Kathryn Rich.  Seven witnesses testified at the hearing, and nineteen exhibits were received into evidence.  Supplemental briefing concluded on May 7, 2019.  Based on careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be granted.

1

## JURISDICTION

Defendant is charged in an Indictment with two counts Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) and (b)(1)(B).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

In April of 2018, law enforcement was investigating a large-scale drug conspiracy involving methamphetamine and heroin.  The investigation involved suspected drug trafficking by Cathy Wells.[1]  A confidential informant provided law enforcement with corroborated information regarding a prior traffic stop resulting in the seizure of controlled substances, Ms. Wells' current address, Ms. Wells' vehicle description, and the location of a storage unit where Ms. Wells conducted drug transactions.  (Doc. 132 at p. 9-10, 48-49).  The confidential informant believed that Ms. Wells' drug supply source was from Colorado.  Id. at 13-14.

The storage complex that Ms. Wells utilized for her drug trafficking is located off Deadwood Avenue, in Rapid City, South Dakota.  Id. at p. 10.  The storage unit owned by Ms. Wells is not visible from outside the storage complex, as her unit is accessed through an exterior door leading to an interior

_____

[1] Cathy Wells is a co-defendant charged in the Indictment in this case.  Ms. Wells pled guilty to Count I of the Indictment and was sentenced on July 30, 2019, to 240 months custody.

hallway which provides indoor access to multiple individual storage units.  Id. at p. 42.

The confidential informant conducted two controlled drug purchases from Ms. Wells in April of 2018 at Ms. Wells' storage unit #114.  Id. at p. 10. Law enforcement conducted electronic surveillance on Ms. Wells by placing a tracking device on Ms. Wells' red Chevy Tahoe, as well as, a 24-hour video surveillance of the storage unit.  The video surveillance provided alerts via a geofence that notified law enforcement when the red Tahoe would enter the storage unit complex.  Id. at p. 12-13.

On the late evening of April 24, 2018, DCI Special Agent Bob Palmer, a member of the Unified Drug Narcotics Enforcement Task Force ("UNET"), observed via vehicle tracking device that Ms. Wells' red Tahoe was at the Econolodge, in Rapid City.  Id. at p. 13-14.  When he checked the tracking device again the next morning around 7 a.m., Ms. Wells' vehicle was still at the Econolodge, leading one to believe that she spent the night at the hotel.  Id. Agent Palmer felt it was unusual that Ms. Wells would stay at the hotel, because she lived a short distance away in Box Elder, South Dakota.  Id. at p. 14-15.  Law enforcement believed she was meeting with someone at the hotel. Id. at p. 15.

At approximately 7:38 a.m. on April 25, 2019, law enforcement was alerted by video surveillance that Ms. Wells' red Tahoe was entering the storage unit facility near Deadwood Avenue.  Id. at p. 17.  A second vehicle, a white Honda Ridgeline pickup truck with Colorado dealer plates, was following the

red Tahoe into the storage facility.  Id.  At 7:39 a.m., an individual wearing a

brown hooded coat exited the passenger side of the Honda Ridgeline and

entered an exterior door leading into the storage facility, along with the

occupant of the red Tahoe.  Id. at p. 17-18, 51.  The person wearing the brown

coat was carrying a white and red T-Mobile bag.  Id.  Law enforcement did not

know what was in the bag; they did not know which specific storage unit the

pair entered; they did not see any drugs or money being possessed or

exchanged.  Id. at p. 40-42.  No activity took place for a few minutes while the

pair was inside the storage facility.  Id. at p. 18.  The driver of the Honda

Ridgeline did not enter the storage facility.  Id. at p. 40.  At 7:45 a.m., the two

people exited the storage facility and returned to their vehicles and left the

property.  Id. at p. 18.  Although law enforcement now believes the two

individuals to be Cathy Wells and Walter Segura, at the time of the

surveillance, they did not know who these two individuals were.  Id. at p. 39.

Agent Palmer requested the assistance of additional officers to locate the

white Honda Ridgeline.  Id. at p. 19.  The Honda Ridgeline was spotted

following the red Tahoe on Interstate 90 traveling east toward Box Elder.  Id. at

p. 21.  The vehicles traveled first to Ms. Wells' residence[2] on Mockingbird Drive,

where law enforcement observed two males exit the Honda Ridgeline and walk

toward the residence along with the driver of the red Tahoe.  A short time later,

the three individuals left the residence and traveled a few blocks to Ms. Wells'

---

[2] Ms. Wells was in the process of purchasing the trailer house on Mockingbird
Drive and moving from her previous trailer house on Gumbo Drive.  Id. at p.
22.

former residence on Gumbo Drive.  While at the Gumbo Drive address, law enforcement observed the three individuals opening the hood of a white Mazda, presumably belonging to Cathy Wells.  Id. at p. 35.

The white Honda Ridgeline then left Ms. Wells' residence and traveled to a Sinclair gas station near Highway 79.  Id. at p. 53, 67.  Two males exited the Honda Ridgeline and were at the gas station for a considerable period of time, filling up the vehicle with gas and entering the convenience store.  Id.  At this time, the two males' identity was still unknown to law enforcement.  Id. at p. 69.

Law enforcement engaged in a discussion about stopping the white Honda Ridgeline.  Id. at p. 24.  Agent Palmer testified that the goal of law enforcement in stopping the vehicle "was to identify the two male subjects inside the white Ridgeline."  Id.  Agent Palmer testified that law enforcement didn't know if they should continue the investigation and try to "get them bringing drugs back to Ms. Wells at a later date" or if they should "essentially stop the investigation and conduct search warrants following."  Id. at p. 25-26. Agent Palmer testified that at that time they knew Ms. Wells was being sourced large amounts of methamphetamine and heroin from a source out of Colorado. Id. at p. 25.  He concluded, "We believed that the white Ridgeline was that source."  Id.  However, the record is devoid of any facts offered in support of such a conclusion, other than that the Honda Ridgeline had Colorado license plates and was at the storage unit and Ms. Wells' residence.

5

The decision was made that the highway patrol would execute a traffic stop of the Honda Ridgeline. Id. at p. 25, 55. Regarding the decision to have a uniformed highway patrol execute the stop, DCI Special Agent Preston Palmer testified as follows:

> A:    ... at that point in time this case was evolving as it progressed in its investigative state, and it was undecided at that time if we are law enforcement or as undercover police officers working the narcotics investigation were planning to divulge any detailed information to the individuals in the white Honda Ridgeline.
>
> Q:    Meaning if you were to become involved they might know that they were under investigation?
>
> A:    Yes. If an unmarked police officer in pain clothes were to have stopped on the roadside and started asking specific questions related to our investigation it would very obviously indicate that there was an investigation involving drugs going on behind the scenes.

Id. at p. 55-56.

The Honda Ridgeline left the gas station and traveled south on Highway 79. Id. at p. 74. Sergeant Casey Kenrick, a member of the Pennington County Sheriff's Office and investigator with the Unified Narcotics Enforcement Team became involved with the surveillance of the Honda Ridgeline near Campbell Street, a portion of Highway 79. Id. at p. 81-82. Sgt. Kenrick was conducting surveillance from his unmarked tan minivan. Id. at p. 82. Sgt. Kenrick testified that he observed the white Honda Ridgeline commit a traffic violation, to-wit: a lane violation due to its driver's side tires crossing over the centerline. Id. at p. 83-85, 92-94. Sgt. Kenrick radioed his observation to other law enforcement. Further details of Sgt. Kenrick's testimony will be discussed infra.

6

Previously, Agent Patterson requested the assistance of South Dakota Highway Patrol Trooper Clay Kartak with making the traffic stop and provided information regarding the location and anticipated route the white Honda Ridgeline would travel.  Id. at p. 110.  Trooper Kartak and South Dakota Highway Patrol Trooper Stuart Griffith positioned themselves in the median crossover of the divided, two-lane Highway 79, approximately one mile south of Rapid City near where the Rapid City landfill is located.  Id. at p. 110-111, 151. Both Trooper Kartak and Trooper Griffith were parked facing north.  Id. at p. 110-111.  Trooper Kartak observed the white Honda Ridgeline traveling southbound out of Rapid City.  Trooper Kartak testified that right as it passed his location, he observed the Honda Ridgeline commit the traffic violation of following another vehicle too closely.  Id. at p. 112.  Trooper Kartak entered the southbound lane and traveled south following the white Honda Ridgeline.  Id. After following the vehicle for a period of time, Trooper Kartak testified that he observed the violation happen again, as "[i]t was still following the vehicle a little too close."  Id.  Trooper Griffith also testified that "at one point it looked to me like the Ridgeline was following another vehicle too closely."  Id. at p. 152. Further details of Trooper Kartak and Trooper Griffith's testimony will be discussed *infra*

Trooper Kartak conducted a traffic stop of the white Honda Ridgeline at mile marker 68, approximately five miles from where he was parked in the median waiting to intercept the Honda Ridgeline.  Id. at p. 134; (Ex. 5). At approximately 9:14 a.m., Trooper Kartak took steps to issue the driver of the

vehicle, Mr. Diaz, a written warning ticket for following too closely.  Id. at p.
120.  Trooper Brian Swets arrived on scene and ran his drug dog around the
vehicle.[3]  Ultimately, the vehicle was searched, resulting in the discovery of a
large amount of cash. Mr. Diaz was questioned by law enforcement pertaining
to the items found from the search.  Mr. Diaz moves to suppress the evidence
and statements obtained as a result of the search.

## DISCUSSION

Mr. Diaz argues that the traffic stop lacked probable cause and therefore,
the seizure and subsequent searches and evidence obtained thereafter must be
suppressed.  The government argues that the testimony of Sgt. Kenrick,
Trooper Kartak, and Trooper Griffith establishes that a traffic violation
occurred and therefore, the stop was constitutionally valid.  (Doc. 142 at p. 5).
Further, the government argues that there was sufficient probable cause to
believe that the white Honda Ridgeline was connected to a narcotics
investigation and therefore, the stop was a permissible investigatory Terry stop.
(Doc. 116 at p. 4-9; Doc. 142 at p. 3-4).

### I.    Whether the traffic stop violated the Fourth Amendment

#### A. Whether the stop was lawful based on traffic violations

A traffic stop is a "seizure" under the Fourth Amendment "and must be
supported by probable cause or reasonable suspicion."  741 F.3d at 876;
Brendlin, 551 U.S. at 255–56.  A traffic stop is supported by probable cause

---

[3] Because of the court's conclusion of law as to the constitutionality of the
initial traffic stop, it unnecessary to develop a detailed record regarding the
drug dog sniff.

"[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law."  Id. (alteration in original) (citation omitted). This is true even when the traffic violation is minor, and the stop is simply "a pretext for other investigation."  United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008); see Whren v. United States, 517 U.S. 806, 813 (1996).  The less-rigorous standard of reasonable suspicion "exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  United States v. Mosley, 878 F.3d 246, 251 (8th Cir. 2017) (citation omitted).

Grounds for a traffic stop may rest on an officer's mistake of fact or law, provided that the mistake is objectively reasonable.  Heien v. North Carolina, 135 S.Ct. 530, 536–39 (2014); United States v. Gaffney, 789 F.3d 866, 868 (8th Cir. 2015).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in the light of the totality of the circumstances.  To be reasonable, the suspicion must be more than an 'inchoate and unparticularized suspicion or "hunch."'"  United States v. Garcia, 23 F.3d 1331, 1334 (1994) (citing United States v. Sokolow, 490 U.S. 1, 8 (1989); Terry v. Ohio, 392 U.S. 1, 27 (1968)).

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors – quantity and quality – are considered in the 'totality of the

9

circumstances – the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990) (quoting <u>Untied States v. Cortex</u>, 449 U.S 411, 417 (1982)).

SA Patterson testified that the traffic violation, not the drug investigation, was the reason for the stop.  (Doc. 132 at p. 79).  Trooper Griffith testified that they were to establish an independent violation to make the traffic stop, if possible.  <u>Id.</u> at p. 170.  The court will analyze the testimony presented regarding the three alleged traffic violations.

### 1. The lane violation

Trooper Kartak testified that he did not observe the lane violation.  <u>Id.</u> at p. 112; 141).  Trooper Griffith testified that he only observed one traffic violation, to-wit: following too closely.  (Doc. 169 at p. 169, 152).  Only Sgt. Kenrick observed the alleged lane change violation.  Sgt. Kenrick was conducting surveillance in his tan, unmarked minivan.  <u>Id.</u> at p. 83.  Sgt. Kenrick testified that as he was "traveling south of Black Gap area, but north of the Spring Creek area, I noticed that [Troopers Kartak and Griffith] were pulled in what's called a crossover between the highways."  <u>Id.</u>  According to Sgt. Kenrick, it was at that point, that the Honda Ridgeline slowed down, and Sgt. Kenrick pulled into the left turn lane to go around the Honda Ridgeline. <u>Id.</u> at p. 83-84.  As Sgt. Kenrick went past the Honda Ridgeline, he looked into his rear-view mirror and observed the driver of the Honda Ridgeline also look into his rear-view mirror to look at the Troopers they just passed.  <u>Id.</u> at p. 84. While the Honda Ridgeline driver was looking into his review mirror, Sgt.

10

Kenrick observed the Honda Ridgeline "driving straight down the middle - - - over the center line." Id.  Sgt. Kenrick then radioed the case agent stating that he observed a traffic violation.  Again, this alleged violation occurred right as they were passing the location of Troopers Kartak and Griffith.  Id. at p. 85. Sgt. Kenrick watched the Honda Ridgeline through his rearview mirror long enough to call the violation in.  Id. at p. 88.  Sgt. Kenrick recalled being "pretty close" and quantified it as, "I couldn't have been more than five or six car lengths ahead of it when I saw that."  Id.  Sgt. Kenrick testified that he was still in the left passing lane when observing through his rearview mirror the Honda Ridgeline driver looking into his rear-view mirror.  Id. at p. 91.  Other observations made by Sgt. Kenrick, include the following: the Ridgeline "slammed" on its breaks, causing Sgt. Kenrick to go around it, presumably because the Ridgeline observed the Troopers parked on the road; the Ridgeline was traveling below the speed limit; the Ridgeline swerved over into the left lane, straddling the lane, and then back into the right lane; at the time this alleged violation occurred, traffic was intermitted, but Sgt. Kenrick didn't recall it being bunched or grouped into a cluster.  Id. at p. 85-87, 92.

The court will not consider Sgt. Kenrick's testimony in a vacuum. Instead, it must be consistent with the other testimony presented, which contradicts Sgt. Kenrick's testimony, and renders it not credible.[4]  Trooper

---

[4] The court does *not* find that Sgt. Kenrick, Trooper Kartak or Trooper Griffith made any intentional misrepresentation during their testimony.  The court has had other opportunities to observe Sgt. Kenrick testify and previously found him to be a credible witnesses.  The court simply finds that the three versions of facts as testified to by Sgt. Kenrick, Trooper Kartak and Trooper Griffith regarding the alleged traffic violations to be irreconcilable with each other and unreliable, and therefore, not credible.

Kartak testified that while he was waiting at the crossover, Sgt. Kenrick radioed that he observed a lane violation.  Id. at p. 132-133.  Importantly, Trooper Kartak testified that this occurred *prior* to the Honda Ridgeline reaching his location.  Id.  This is inconsistent with Sgt. Kenrick's testimony that the lane violation occurred as they passed Trooper Kartak's location.  Trooper Kartak testified that he did not observe a lane violation.  Id. at p. 112.  Instead, Trooper Kartak testified that the observed a traffic violation for following too closely right as the Honda Ridgeline passed his location.  Id. at p. 112, 129.

Trooper Kartak's description of his observations on the scene as the Honda Ridgeline reached and passed his location renders Sgt. Kenrick's testimony that he observed in his rear-view mirror the Honda Ridgeline driver look up into his rear-view mirror not credible.  Specifically, Trooper Kartak testified that as the Honda Ridgeline passed his location, there were a cluster of three cars in front of the Honda Ridgeline.  Id. at p. 128-129.  The Honda Ridgeline was in the driving lane and was following a large SUV.  Id. at p. 131-132.  Trooper Kartak estimated that the Honda Ridgeline was a car length and a half behind the large SUV.  It is unclear how much farther the other two cars were in relation to the SUV.  Sgt. Kenrick testified that at this same time, he was in the passing lane approximately five to six car lengths ahead of the Honda Ridgeline, when he could see through his rear-view mirror, the Honda Ridgeline cross the center line while the driver looked into his rear-view mirror.

In a previous case analyzing whether a traffic violation was supported by reasonable suspicion, the District Court for the District of South Dakota

12

precisely described the standard to be applied when resolving the issue at hand:

> The determinative question is not whether [the driver] violated [the law] . . . but whether an objectively reasonably police office could have formed a reasonable suspicion that [the driver] was committed [such a] violation." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005).  Even if [the officer] was mistaken about the existence of the [traffic] violation, "the validity of the stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake whether of law or fact, was an objectively reasonable one."  Id.  (quoting United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005)).

United States v. Little, No. CR 09-50099-JLV, 2010 WL 1428448, DSD April 7, 2010, at * 5. (D.S.D. April 7, 2010).  Subjective good faith is not sufficient to justify the stop.  Instead it must be objectively reasonable.  Id.

The location of the SUV, and possibly the other two cars, renders Sgt. Kenrick's testimony regarding his observations not credible.  The court finds that the conclusion that a lane violation occurred was not objectively reasonable; and therefore, the stop based on this rationale was unconstitutional.

### 2.  Following too closely- at location of crossover median

Despite the fact that law enforcement was waiting in anticipation of making a traffic stop on the Honda Ridgeline, the Troopers' dashcam videos were not activated until after the first alleged following too closely violation occurred.  Id. at p. 116.  On the day in question, the roads were dry; visibility was good.  Id. at p. 132-133; 171.  Trooper Kartak testified that right as the

13

Honda Ridgeline passed[5] his location, he observed the vehicle was following another vehicle too closely. Id. at p. 112. Few details can be gleaned from records regarding facts relied upon by Trooper Kartak in reaching this conclusion. Trooper Kartak testified that there was a cluster of vehicles in front of the Honda Ridgeline, with the closest vehicle directly in front of the Honda Ridgeline being a large, dark colored SUV. Id. at p. 128-132. Trooper Kartak testified that the Honda Ridgeline was less than three seconds behind the dark colored SUV. Id. at p. 130-131. He estimated that the distance between them was a car length and a half. Id. However, Trooper Kartak admitted that he didn't know how fast the vehicles were going, as he didn't get their speed on the radar. Id. The record is unclear as to the speed limit for this portion of Highway 79. SA Patterson testified he didn't know what the speed limit was at that portion of the highway, just that farther south the speed limit is 65. Id. at p. 72. Sgt. Kenrick thought the speed limit was 65 or 70. Id. at p. 86.

Although not discussed by the government's briefing, or during the evidentiary hearing, the court presumes the statute relied upon by the government is SDCL § 32-26-40 which provides as follows:

> The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and condition of the highway. A violation of this section is a Class 2 misdemeanor.

---

[5] Trooper Kartak later stated that it occurred right before he passed his location. Id. at p. 129.

SDCL § 32-26-40.  The record is devoid of any evidence regarding how fast the Honda Ridgeline was going, other than it was going below the speed limit, causing Sgt. Kenrick to go around the Honda Ridgeline simply by maintaining his speed.  Id. at p. 86-88.  Trooper Kartak testified that he did not see the car in front of the Honda Ridgeline slow down.  Id. at p. 132.

Trooper Griffith, whom was parked right beside Trooper Kartak, did not see this violation.  Id. at p. 167-169.  Trooper Griffith was questioned regarding the Honda Ridgeline's proximity to other vehicles at the time it passed the location of the parked troopers.  He conceded that his police report recorded, "Castro hit his brakes after passing, despite being below the speed limit and no other vehicle or obstruction nearby."  Id. at p. 168-169.  Trooper Griffith's testimony that there was not traffic close enough[6] to the Honda Ridgeline to warrant the need to hit his brakes to avoid a collision (Id. at 168), as well as Sgt. Kenrick's testimony that the Honda Ridgeline was traveling below the speed limit and hit its brakes upon seeing the parked patrol cars, renders Trooper Kartak's testimony not credible as it pertains to the first alleged violation of following too closely at the location where the Honda Ridgeline passed the parked troopers.  For these reasons, the court concludes that it was not objectively reasonable to conclude that a following too closely violation occurred at the location where the Honda Ridgeline passed the parked troopers.  Therefore, the stop based on this rationale is unconstitutional.

---

[6] Sgt. Kenrick also did not recall a cluster of vehicles as he and the Honda Ridgeline passed the parked troopers.  Id. at p. 87.

### 3. Following too closely- at location of bridge

Both Trooper Kartak and Trooper Griffith testified that they observed a following too closely traffic violation as the Honda Ridgeline crossed a bridge near Spring Creek.  After the Honda Ridgeline passed the parked troopers, they both pulled out and traveled southbound following the Honda Ridgeline for approximately five miles.  The dashcam video, which was admitted as Exhibit 5, recorded the view of Trooper Kartak from which he would have viewed the alleged violation.  Id. at p. 114-115.  The clips from the video were played during the evidentiary hearing and both Troopers were questioned about the video.  The court has also independently studied the video.

Trooper Kartak testified that around 9:13:11 a.m., as depicted in Exhibit 5, he observed the Honda Ridgeline follow a vehicle too closely.  Id. at p. 116-117.  He testified that the violation occurred right next to the bridge depicted in the video at 9:13:11 a.m.  Id. at p. 116.  At 9:13:54 a.m., Trooper Kartak activated his emergency light and initiated the traffic stop.  (Doc. 132 at p. 117; Ex. 5).  Trooper Kartak guessed that the distance between the vehicles was twenty yards; he was not monitoring the speed of either the lead vehicle or the Honda Ridgeline.  Id. at p. 140-141.

The stretch of road directly leading up to Trooper Kartak activating his lights is straight and relatively flat.  Id. at p. 136; Ex. 5.  From 9:12:39 a.m to 9:13:10 a.m, Trooper Kartak admitted could not clearly see what was in front of the Honda Ridgeline.  Id. at p. 136.  He testified that he knew there was another vehicle in front of the Honda Ridgeline and concluded that the Honda

16

Ridgeline was following too closely because he couldn't see the leading vehicle. Id. at p. 136-137.  Apparently, Trooper Kartak relied upon the location of the shadow of the Honda Ridgeline and the shadow of the vehicle in front of it to conclude that the Honda Ridgeline was following too closely.  Id. at p. 17.

Trooper Griffith was traveling behind Trooper Kartak.  Id. at p. 152. Trooper Griffith, with little to no details concluded, "At one point it looked to me like the Ridgeline was following another vehicle too closely."  Id. at p. 152. This conclusion is curious, given that Trooper Griffith had an even more obstructed view of the distances between the Honda Ridgeline and the lead vehicle.  Exhibit 5, the dashcam video from Trooper Kartak's vehicle, not Trooper Griffith's vehicle, was played and essentially Trooper Griffith rendered an opinion as to when the video depicts the traffic violation.  Id. at p. 153. Trooper Griffith testified that the video contained a better view of the alleged violation than what he observed, since "there was a car between [him] and them."  Id. at p. 153.  Trooper Griffith also testified that he observed the shadows of the two vehicles, which presumably formed some of the basis for his conclusion.  Id. at p. 154.  When shown the video, Trooper Griffith conceded that he could not accurately pair the moment on the video with the point in time which he thought to himself that the Honda Ridgeline was following too close.  Id. at p. 183.

The court has reviewed the video from Trooper Kartak's vehicle.  The video depicts that from 9:12:39 a.m until 9:13:16 a.m., the dark SUV which the Honda Ridgeline is allegedly following too closely, is not within view of Trooper

17

Kartak. Ex. 5.  The time period where Trooper Kartak and Trooper Griffith claim the Honda Ridgeline was follow too closely was in the area of the bridge. Id.  The video shows the Honda Ridgeline passing the bridge between 9:13:06 a.m. and 9:13:11 a.m. during which time, the dark SUV is not within the view of the video.  Id.  In fact, the first glimpse of the dark SUV doesn't occur until 9:13:17 a.m., which is well after they pass the bridge.  Id.  From 9:13:17 a.m. until 9:13:47 a.m., the video depicts the dark SUV in front of the white Honda Ridgeline.  Id.  Yet, during this time period, Trooper Kartak does not activate his emergency lights.  Id.  From 9:13:47 a.m. and thereafter, the dark SUV cannot be seen in the video.  Id.  Trooper Kartak activates his emergency lights at 9:13:53 a.m.  Id.  The court finds Trooper Kartak's and Trooper Griffith's testimony that the lane violation occurred at the area of the bridge not objectively reasonable, when in fact, the video shows that the view of the dark SUV and the distance between the two vehicles was obstructed by the topography of the road and placement of the vehicles directly behind each other.

The speed limit was a 65 mph zone.  (Doc. 132 at p. 143).  The record is devoid of any specific facts regarding how fast Honda Ridgeline or the dark SUV were traveling, whether one of the vehicles was accelerating or decelerating, or how much measured distance (other than Trooper Kartak's guess) was between the vehicles.  The driving conditions were excellent and there is no objective evidence to support Trooper Kartak and Trooper Griffith's conclusion that the Honda Ridgeline was following too closely.  The court had an opportunity to

18

observe their testimony and demeanor in court.  Neither Trooper Kartak or Trooper Griffith appeared confident or convinced in the conclusion that the Honda Ridgeline was following too closely.  In fact, Trooper Kartak volunteered his skepticism that this traffic violation occurred.  When turning to this second alleged violation, the prosecution asked, "And then was there another time he was following too closely?"  Trooper Kartak responded, "There was -- I guess I misspoke.  There was a *chance* as I was headed southbound, and it was following their vehicle too close."  Id. at p. 116 (emphasis added).

Based on the lack of any detail regarding the speed of the vehicles, the distance between the vehicles, any explanation as to why the Honda Ridgeline was traveling more closely than is reasonable and prudent, the observed hesitancy of the witnesses, and the court's own study of Exhibit 5, the court concludes that no credible evidence exits that a following too closely violation occurred at the location next to the bridge.  The unsupported conclusion that the Honda Ridgeline was following too closely, absent any objective supporting facts, is not factually reasonable or an objectively reasonable application of the law.  Therefore, the stop based on this rationale was unconstitutional.

### B. Whether the stop was lawful due to drug investigation

Despite SA Patterson's testimony that the traffic violation was the reason for the stop, the government asserts that the stop was valid because "[t]here was probable cause to stop the defendant's vehicle based on its connection to the ongoing drug conspiracy." (Doc. 116).  Having determined that no factually reasonable or objectively reasonable application of the traffic law permitted the

warrantless stop, the court will address whether the investigatory stop was permissible under Terry v. Ohio, 392 U.S. 1 (1968).

"Terry permits law enforcement officers to make such a limited seizure of individuals suspected of criminal activity if the officer has 'specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Terry, 392 U.S. at 21.  A police officer may stop an automobile if he has "reasonable suspicion" that the occupant of the automobile is subject to seizure for violation of the law. Delaware v. Prouse, 440 U.S. 648, 653 (1979).  An officer has reasonable suspicion sufficient to make a warrantless stop if the officer can point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Owens, 101 F.3d 559, 561 (8th Cir. 1996) (quoting Terry, 392 U.S. at 21).

An officer's observation of legal but "out of the ordinary" activity which describes too large a category of people is not alone a sufficient basis to develop an individualized suspicion for a traffic stop.  E.g., United States v. $45,000,000 in U.S. Currency, 749 F.3d 709, 723 (8th Cir. 2014); United States v. Jones, 606 F.3d 964, 967–98 (8th Cir. 2010).  However, police may take an individual's proximity to others suspected of engaging in criminal activity into account when determining whether reasonable suspicion exists. United States v. Cobo-Cobo, 873 F.3d 613, 617 (8th Cir. 2017); United States v. Bustos-Torres, 396 F.3d 935, 942–43 (8th Cir. 2005); Owens, 101 F.3d 559, 561–62 (8th Cir. 1996); United States v. Flett, 806 F.2d 823, 827–28 (8th Cir.

1986). See also United States v. Zuniga-Valencia, No. 4:11CR41, 2011 WL 2604796, at \*4–7 (D. Neb. June 30, 2011). To be reasonable, the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.

The government produced testimony regarding Cathy Wells' drug trafficking activities. Specifically, law enforcement conducted two controlled purchases of narcotics from Cathy Wells at her storage unit on Deadwood Avenue. Confidential informants believed that Cathy Wells' supply of drugs was obtained from Colorado. Law enforcement had gathered detailed information on Cathy Wells, including the following: her former and current residences, her vehicles, real time tracking of her red Tahoe, her storage unit number, and her association with suspected drug co-conspirator, Bryaunah Stewart. However, no information was known to law enforcement about the occupants of the Honda Ridgeline. The information known the law enforcement about Honda Ridgeline was 1) it had Colorado dealer plates; 2) the vehicle went to the storage facility location; 3) the passenger exited the vehicle carrying a red and white T-Mobile bag; 4) the passenger entered the storage facility along with the driver of the red Tahoe and remained inside for approximately nine minutes; 5) the vehicle followed the red Tahoe to Cathy Wells' residences and remained there for a few minutes where the only activity observed was opening the hood of a white Mazda belonging to Cathy Wells; and 6) the vehicle left, filled up with gas, and headed south on Hwy 79, a common route used to travel to Colorado.

Law enforcement did not know the identity of the occupants of the Honda Ridgeline.  In fact, their objective in conducting the traffic stop was to identity the two male subjects.  (Doc. 132 at p. 24).  Although law enforcement later learned that the driver of the red Tahoe was Cathy Wells, at the time she exited her vehicle at the storage unit, Agent Palmer testified that he did not know it was Cathy Wells meeting the passenger of the Honda Ridgeline.  Id. at p. 39.  Law enforcement didn't observe a specific unit that the suspects went into, as the exterior door led to a hallway leading to multiple individual storage units.  Id. at p. 41-42.  Law enforcement did not observe any narcotics or money changing hands.  Id. at p. 41.

In United States v. Bustos-Torres, the Eighth Circuit considered whether officers had reasonable suspicion of a drug trafficking to conduct a traffic stop.  396 F.3d at 935 (8th Cir. 2005).  There, a deputy observed a suspected drug transaction, while conducting surveillance in an area known for drug trafficking.  Id. at p. 939.  Specifically, a vehicle pulled into a parking lot and the driver got out and met another man who handed the driver a small plastic baggie in exchange for money.  Id.  The driver got back into his car and left the area.  Id.  Based on his knowledge and experience, the deputy was certain he witnessed a drug transaction.  Id.  However, at the time, the deputy was conducting surveillance for an unrelated dangerous fugitive arrest warrant and therefore, did not interfere with the transaction.  Id.  Several minutes later, the deputy was ordered to terminate surveillance.  Id.  At that same time, the deputy observed the same suspected seller, later identified as Antonio Thelen,

22

enter a car containing three men, and then reemerge minutes later. Id. at p. 939–40. The deputy believed he had observed another drug transaction, and he conducted an investigatory stop of the car containing the three men. Id. at p. 940. Officers conducted pat-down searches of the three occupants and found $10,000 in one occupant's pockets. The Eighth Circuit upheld the district court's finding of reasonable suspicion, stating the first apparent drug transaction provided reasonable suspicion to believe Mr. Thelen sold drugs. Id. at p. 942–43. When Mr. Thelen entered the second car, the deputy had reasonable suspicion to believe a second drug transaction occurred, justifying the investigatory stop of the three men. Id. Significantly, the two transactions took place within minutes in a location notorious for drug trafficking in a parallel sequence of events. Id. These factors compelled the Eighth Circuit to reject the defendants' argument that "anyone who associated with Mr. Thelen after the first transaction [would be a suspect]." Id. at p. 942. The court, although declining to analyze a hypothetical of whether reasonable suspicion would have existed had the second encounter not followed the first, even in a location known for drug sales, described it as compelling argument that the stop lacked reasonable suspicion. Id.

In United States v. Garcia, the Eighth Circuit reversed a district court's finding that a Nebraska State Patrol Trooper had reasonable suspicion of criminal activity necessary to support an investigatory stop of the defendant's vehicle. 23 F.3d 1331 (8th Cir. 1994). The Trooper observed a U-Haul rental truck drive onto the shoulder of the road three times and pulled the vehicle

23

over on suspicion that the driver was impaired.  Id. at 1333.  The officer issued

a warning ticket and questioned the U-Haul truck occupants about its itinerary

and purpose.  Id.  The occupants explained that the truck contained furniture

and they were moving to El Paso.  Id.  They then corrected the narrative to

state that they were taking furniture to El Paso.  Id.  The driver produced an

alien identification card showing a residence in Chihuahua, Mexico.  Id.  The

occupants denied possessing any weapons or narcotics and allowed the

Trooper to observe the cargo compartment containing boxes tied together with

nylon rope.  Id.  The Trooper let the occupants proceed on their way.  Id.

Shortly thereafter, the previously requested records check from the El Paso

Intelligence Agency returned information that the defendant had a prior arrest

for a firearms violation.  Id.  The Trooper requested assistance and another

Trooper stopped the truck approximately thirty miles west of the original stop.

The U-Haul was searched, and narcotics and large amounts of cash were

found.  Id. at 1334.  The Eighth Circuit found "it difficult to perceive the

connection between driving a rented truck full of furniture in Nebraska and

drug trafficking."  Id. at 1335.  Despite the unusualness of transporting

furniture from Nebraska to Texas; that they were Mexican citizens which spoke

to each other in Spanish; that they were traveling to a source city; and the

driver had a prior firearms offense, the court found that all the facts taken

together did not create a reasonable, articulable suspicion that the occupants

were engaged in illegal activity.  Id. at 1336.  The Court stated, "[w]e are not

empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs."  Id.

The facts of the case at hand falls somewhere between Bustos-Torres and Garcia.  The only evidence offered to support the belief that the Honda Ridgeline had any connection to illegal activity, was that the vehicle had Colorado plates, the unknown occupants met with an unidentified person driving a vehicle belonging to a known narcotics trafficker (who was believed to obtain her drug supply from Colorado) at a location where prior controlled narcotics transactions were made, and the unidentified trio then spent a short period of time at Cathy Wells' residences.

Curiously, the facts presented here closely mirror the compelling hypothetical presented to the Court in Bustos-Torres, which it declined to entertain.  See 396 F.3d at 342 ("Perhaps more compelling is defendant's argument Deputy Bradt absolutely would have lacked reasonable suspicion had the second encounter not followed the first, even in a location known for drug sales.  Stimulating as it may be, we would not entertain the hypothetical over the actual.").  In the case at hand, the testimony of Agent Palmer establishes that there was a previous controlled narcotics purchase at the storage unit.  However, it appears that this occurred at an earlier date.[7]  Unlike the Bustos-Torres transaction, the record in this case is devoid of any evidence

_____

[7] The record simply indicates that the controlled buy occurred sometime in April of 2018.  Testimony from Agent Palmer indicates that the red Tahoe was at an Econolodge from the evening of April 24, 2018 until it entered the storage unit complex around 7:30 a.m.  (Doc. 132 at p. 10, 13-14, 17).

of a previous drug transaction conducted in parallel fashion occurring within minutes of the Honda Ridgeline's arrival at the storage unit.  There is no evidence regarding the identity of the occupants of the Honda Ridgeline; where it was prior to entering the storage unit facility; any specific details regarding whether Ms. Wells was expecting a shipment of narcotics; whether the occupants had any history of criminal activity; or if they were aware if Ms. Wells was engaged in criminal activity.

Essentially, if this court concludes that reasonable suspicion exists under these circumstances, any person driving a vehicle with Colorado license plates who interacted with Ms. Wells[8] or was in close proximity to her property would be subject to a Terry search.  See Reid v. Georgia, 448 U.S. 438, 441 (1980) ("The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."); Johnson v. Campbell, 332 F.3d 199, 208 (3d Cir.2003) ("There are limits . . . to how far police training and experience can go towards finding latent criminality in innocent acts.") The Eighth Circuit has cautioned against implicating a person simply because of their association with a drug trafficker.  United States v. Lopez-Zuniga, 909 F.3d 906, 909-910 (8th Cir. 2018) ("If this amount to probable cause, 'then *anyone* who drops a drug

---

[8] Again, at the time law enforcement observed the interaction of the people at the storage unit and at the residence, they did not know the identity of the trio. It was only later that they learned that the driver of the red Tahoe was Cathy Wells and the Honda Ridgeline passenger was Walter Segura.

trafficker off at the trafficker's residence and travels with the trafficker for innocent activity, such as the trafficker's grandmother or mere acquaintance, would be subject to search.'").

Although an argument can be made that law enforcement has reasonable suspicion, or even probable cause, that illegal drug activity was going on at the storage unit, the court concludes that they did not have reasonable suspicion that the defendant or his passenger were engaged in criminal activity at the time when their vehicle was stopped; and therefore, was in violation of the Fourth Amendment.

### C. Whether the constitutional violation warrants suppression

Concluding that the traffic stop of the defendant was unlawful does not end the inquiry, however. Another level of analysis determines whether any evidence should be excluded as a result of this constitutional violation. Neither party addressed in their brief this second half of the Fourth Amendment equation. However, in an effort to provide a complete decision to the district court, this court will address the issue. "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a result of an unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 485 (citing Silverman v. United States, 365 U.S. 505 (1961)).

The court must consider three factors to determine whether the physical evidence found in the search of the defendant, his vehicle, and any incriminating statement was the fruit of the Fourth Amendment constitutional violation, or whether it was obtained by "means sufficiently distinguishable to

be purged of the primary taint." <u>Wong Sun</u>, 371 U.S. 487-88.  Those three factors are: (1) the temporal proximity of the discovery of the evidence to the Fourth Amendment violation; (2) the existence of intervening causes between the violation and the discovery; and (3) the purpose or flagrancy of the official misconduct.  <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975).  Of these factors, the purpose and flagrancy of police misconduct is "the most important factor because it is directly tied to the purpose of the exclusionary rule–deterring police misconduct." <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006) (citing <u>United States v. Reed</u>, 349 F.3d 457, 464-65 (7th Cir. 2003)).  In <u>United States v. Peralez</u>, the Eighth Circuit held that physical evidence obtained from a vehicle that had been unlawfully detained need not be suppressed unless the constitutional violation was "at least a but-for cause of obtaining the evidence."  526 F.3d 1115, 1121 (8th Cir. 2008).

Statements that result from an illegal detention are not admissible. <u>United States v. Ramos</u>, 42 F.3d 1160, 1164 (8th Cir. 1994).  A suspect's giving of voluntary statements after waiving <u>Miranda</u> has sometimes been found to purge the taint of an illegal detention.  <u>Ramos</u>, 42 F.3d at 1164.  The causal chain between an illegal arrest and a statement given later is broken, however, "if the statement is 'sufficiently an act of free will to purge the primary taint.'" <u>Id.</u> (quoting <u>Wong Sun v. United States</u>, 371 U.S. 471, 486(1963)). "The giving of <u>Miranda</u> warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility."  <u>Id.</u>  Instead, to decide whether a confession is the product of a free will, courts consider

<u>Miranda</u> warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.  <u>United States v. Hernandez-Hernandez</u>, 384 F.3d 562, 565 (8th Cir. 2004).

Under the facts of this case, the evidence would not have been discovered absent the constitutional violation.  Because the traffic stop was unconstitutional, the subsequent drug dog sweep is likewise unconstitutional.  Additionally, there was minimal separation between the Fourth Amendment violation–the traffic stop–and the searches of Mr. Diaz and the vehicle in which he was traveling or the questioning of Mr. Diaz, with the gap in time due only to the time to tow the vehicle and transport the defendant.  The unconstitutional traffic stop occurred at approximately 9:15 a.m.  (Doc. 132 at p. 112).  The Honda Ridgeline was towed to the Department of Transportation ("DOT") shop and Mr. Diaz was transported to the DOT shop as well.  <u>Id.</u> at p. 248-249.  Rapid City Police Officer Marcos Glass reported to the DOT shop to assist based on his ability to speak Spanish.  <u>Id.</u> at p. 249.  Officer Glass commenced his custodial interview of Mr. Diaz at 11:11 a.m., on April 25, 2018.  (Ex. 6).  This was first opportunity for law enforcement to communicate fluently with Mr. Diaz, as he did not speak English.  Mr. Diaz was questioned on the same day, less than two hours from the time of the illegal stop.

The chain between the illegal arrest and the search of the vehicle and statements made by Mr. Diaz was not broken, given the close temporal proximity between the arrest and the statements.  The record is devoid of any

29

intervening constitutional circumstances.  Further, the court finds that the seizure of Mr. Diaz in the absence of probable cause or reasonable suspicion merit suppression under the third <u>Brown</u> factor.  Accordingly, the court concludes that the taint of the Fourth Amendment violation had not been purged and all evidence deriving from the traffic stop must be suppressed. <u>Wong Sun</u>, 371 U.S. at 488; <u>Guevara-Martinez</u>, 262 F.3d at 755-56.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 95) be granted.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 3rd day of December, 2019.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge