UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CRISTIAN HUMBERTO CASTRO DIAZ,<br><br>Defendants. | CR. 18-50069-02-JLV<br><br>ORDER |

**INTRODUCTION**

A grand jury indicted Cristian Castro Diaz, together with three other defendants, in a multiple-count indictment. (Docket 1). Mr. Castro Diaz is charged with count I: conspiracy to distribute a controlled substance, methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846, and count II: distribution of a controlled substance, heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Id.

Pending before the court is defendant's motion to suppress all physical evidence and statements obtained as the result of the stop of a vehicle being driven by the defendant. (Docket 95). The United States opposes defendant's motion. (Docket 116). Defendant's suppression motion was referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. An evidentiary hearing was held on March 19, 2019. (Dockets 128 & 132).

Following post-hearing briefing, Magistrate Judge Wollmann issued an amended report and recommendation ("R&R"). (Docket 185). The magistrate judge recommended the defendant's motion to suppress be granted. Id. at p. 30. The government timely filed objections to the R&R. (Docket 187). Mr. Castro Diaz filed a response to the government's objections. (Docket 189). For the reasons stated below, the government's objections are granted in part and denied in part.

**GOVERNMENT'S OBJECTIONS**

The government's objections to the R&R are summarized as follows:

1. The government objects generally to the recommendation that defendant's motion to suppress be granted.

2. The government objects to the citation of the testimony of South Dakota Division of Criminal Investigation ("DCI") Special Agent ("S.A.") Preston Palmer because he did not testify but rather DCI S.A. Preston Patterson testified.[1]

3. The government objects to the finding the testimony of Pennington County Sheriff's Office Sergeant Casey Kenrick was not credible.

4. The government objects to the finding an alleged lane violation was not objectively reasonable and was an unconstitutional rationale for the stop.

5. The government objects to the finding the testimony of South Dakota Highway Patrol ("SDHP") Trooper Clay Kartak was not credible.

---

[1]Defendant acknowledges this typographical error in the identification of S.A. Preston Patterson. (Docket 189 at pp. 1-2). The court sustains the government's objection. S.A. Bob Palmer and S.A. Patterson both testified. All references in this order will be to the appropriate witness.

6. The government objects to the finding the alleged first following-too-closely violation was not objectively reasonable and was an unconstitutional rationale for the stop.

7. The government objects to the finding the alleged second following-too-closely violation[2] was not objectively reasonable and was an unconstitutional rationale for the stop.

8. The government objects to the conclusion the stop of the defendant's vehicle violated the Fourth Amendment.

9. The government objects to the conclusion the drug dog sweep was unconstitutional.

(Docket 187 at pp. 1-4). For these reasons, the government argues the court should "sustain the United States' objections to the R&R and deny the defendant's motion to suppress." Id. at p. 24.

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. See also Fed. R. Crim. P. 59(b)(3). The court completed a *de novo* review of those portions of the R&R to which objections

---

[2]The government points out the R&R incorrectly references this event as a "lane violation," instead of a "following too closely [violation]." (Docket 187 at p. 16). Defendant acknowledges the R&R contained this typographical error. (Docket 189 at p. 2). All references in this order will be to an alleged second following-too-closely violation.

were filed.   The government's objections will be addressed in groups deemed

most efficient.

## ANALYSIS

The court completed a *de novo* review of the transcript of the

suppression hearing,[3] the video and audio recordings ("video recording")

produced by Trooper Kartak's patrol car camera, the video recording of the

storage unit, and the photographs relevant to resolving the government's

objections.   (Docket 132 and suppression hearing exhibits 1-5, 7-11, 110, 112

& 113).   Unless otherwise indicated, the court's findings of fact are consistent

with the findings made by the magistrate judge.

GENERAL OBJECTIONS

The government objects generally to the recommendation that

defendant's motion to suppress be granted.   (Docket 187 ¶ 1).   "Congress has

mandated that the district court give de novo review to those portions of a

Magistrate's report and recommendation to which objections are made."   Belk

v. Purkett, 15 F.3d 803, 815 (8th Cir. 1994) (referencing 28 U.S.C. § 636(b)(1)).

"There is a court-created exception in some circuits: '[T]he district court need

not conduct de novo review when a party makes general and conclusory

---

[3]At the government's request, the court listened to FTR ("For The
Record"), the courtroom audio system recording of the suppression hearing at
the same time as it read the transcript of the suppression hearing.   (Docket
187 at p. 23).   The inflexions and cadences of witnesses' voices did not change
the court's findings in this order.

objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations.' " Id. (citing Johnson v. Knable, 934 F.2d 319 (4th Cir. 1991) (unpublished opinion) (citing Orpiano v. Johnson, 687 F.2d 44, 47-48 (4th Cir. 1982); United States v. Merz, 376 U.S. 192, 199, 84 (1964); Pendleton v. Rumsfeld, 628 F.2d 102, 105-06 (D.C. Cir. 1980)). "There is language in an Eighth Circuit case which indicates this Circuit's approval of such an exception." Id. (referencing Branch v. Martin, 86 F.2d 1043 (8th Cir. 1989) ("In the present case, plaintiff's objections to the magistrate's factual conclusions were timely filed and specific enough to trigger de novo review). See, e.g., Goney v. Clark, 749 F.2d 5, 7 (3d Cir. 1984) (per curiam) (no *de novo* review if objections are untimely or general)"). "[D]e novo review is not required 'when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations.' " Hudson v. Gammon, 46 F.3d 785, 786 (8th Cir. 1995) (citing Belk, 15 F.3d at 815) (citations omitted).

The court will address the government's specific objections to the R&R as they are "certainly definite enough to require de novo review." Id. (citing Belk, 15 F.3d at 815). The court is not compelled to evaluate the government's generalized and conclusory objection.

The government's first objection (Docket 187 ¶ 1) to the R&R is overruled.

FACTUAL BACKGROUND

Neither party objected to the magistrate judge's summary of the factual background associated with the activities at co-defendant Cathy Well's storage unit off Deadwood Avenue in Rapid City, South Dakota; the activities occurring in and around her home in Box Elder, South Dakota; or the brief activities occurring at the Sinclair gas station.   See Docket 185 at pp. 2-5.   What is significant surrounding this evidence is the magistrate judge's finding that throughout "this time, the two males' identity [occupants of the Honda Ridgeline] was still unknown to law enforcement."   Id. at p. 5.   S.A. Palmer "testified that the goal of law enforcement in stopping the vehicle 'was to identify the two male subjects inside the white Ridgeline.' "   Id. (referencing Docket 132 at p. 24:17-18).   The coordinated plan of law enforcement was "that the highway patrol [as uniformed officers] would execute a traffic stop of the Honda Ridgeline."   Id. at p. 6.

In preparation for attempting to identify a traffic violation by the Ridgeline, Sergeant Kenrick, in an unmarked tan minivan, followed the vehicle south on Highway 79 out of Rapid City.   Id.   At the same time, Trooper Kartak and Trooper Griffith "positioned themselves in the median crossover of the divided, [four]-lane Highway 79, approximately one mile south of Rapid City . . . [with both of their patrol vehicles] parked facing north."   Id. at p. 7.   Trooper Kartak testified their parked position was at mile marker 73.   (Docket 132 at p. 134:5-6).

The government identified three separate traffic violations by the Ridgeline which justified the traffic stop: (1) a lane violation; (2) a first following-too-closely violation; and (3) a second following-too-closely violation. (Docket 185 at pp. 10, 13 & 16). S.A. Patterson testified these traffic violations, not the underlying drug investigation, were the justification for the traffic stop. (Docket 132 at p. 79:9-16). The court will address the alleged traffic violations in chronological order.

### 1. THE LANE VIOLATION

Sergeant Kenrick testified as he followed the Ridgeline south on Highway 79, the patrol vehicles of Trooper Kartak and Trooper Griffith could be seen ahead parked in the median crossover. (Docket 132 at p. 83:21-24). As Sergeant Kenrick and the Ridgeline approached the median crossover, "[a]t that point [the Ridgeline] slowed down, so [Sergeant Kenrick] had to get into the left lane to go around him." Id. at pp. 83:25-84:1. Sergeant Kenrick stated "it was right around the time we went by the troopers is when I was passing the Ridgeline." Id. at p. 85:22-24. After passing the Ridgeline, the officer testified he was watching the Ridgeline in the minivan's rearview mirror. Id. at p. 88:4-5. He estimates being "five or six car lengths ahead of" the Ridgeline when he observed it "driving straight down the middle—over the center line" between the two south bound lanes. Id. at pp. 84:3-5 and 88:16-7. Sergeant Kenrick testified the driver of the Ridgeline was "looking up at his mirror back at the troopers that we passed in the crossover[.]" Id. at p. 84:3-4. According to

7

Sergeant Kenrick the "Ridgeline was in the right lane . . . it swerve[d] over into the left lane, straddling the lane, and then back into the right lane." Id. at p. 92:3-5. He described the lane violation as "[t]he driver's side, two tires, the front and back crossed the center line, straddling it, and then went back over into the right lane." Id. at pp. 93:24-94:1. Sergeant Kenrick "called the violation in and just continued at the speed limit." Id. at p. 88:17-19.

Although Trooper Kartak did not know where Sergeant Kenrick was when he radioed in the lane violation, Trooper Kartak did "know that [the Ridgeline] was headed towards [his] location." (Docket 132 at pp. 132:24-133:3). Trooper Kartak stated that according to the timing of the radio report from Sergeant Kenrick the lane violation occurred prior to the Ridgeline getting to the troopers' location. Id. at p. 133:7-10. Trooper Kartak did not observe the lane violation reported by Sergeant Kenrick. Id. at pp. 112:1-8. The trooper did not see the Ridgeline commit a lane violation in the area where his patrol vehicle was parked at the crossover. Id. at p. 133:4-5.

Trooper Kartak testified as the Ridgeline passed his location, there was a "cluster" of "maybe three" cars in front of the Ridgeline. Id. at pp. 128:18-129:1. According to Trooper Kartak there was a dark, large SUV about the same size as the Ridgeline ahead of the Ridgeline. Id. at pp. 130:7-8 and 13 and 132:4-6.

The magistrate judge found Trooper Kartak's testimony was "inconsistent with Sgt. Kenrick's testimony that the lane violation occurred as they passed

Trooper Kartak's location." (Docket 185 at p. 12). "Trooper Kartak's description of his observations on the scene as the Honda Ridgeline reached and passed his location renders Sgt. Kenrick's testimony that he observed in his rear-view mirror the Honda Ridgeline driver look up into his rear-view mirror not credible." Id.

The government asserts the magistrate judge erred in finding Sergeant Kenrick's testimony not credible because the R&R "failed to take into account all of the evidence presented at the evidentiary hearing." (Docket 187 at p. 5). Specifically, the government argues the magistrate judge failed to consider the testimony of S.A. Patterson. While he did not observe the lane violation, S.A. Patterson testified he "overheard the radio Sergeant Kenrick relay the traffic violation he observed after [the Ridgeline] had passed the trooper[s'] locations, which would have been south of the trooper[s'] locations." Id. at p. 6 (referencing Docket 132 at p. 75:9-12). The government believes "Agent Patterson's testimony supports Sgt. Kenrick's testimony, as well as the logical conclusion that the lane violation and report of his observance happened close in time to passing the troopers' location." Id. The government argues the magistrate judge gave "[n]o explanation . . . as to why, on this particular point, Trooper Kartak, who was in a less advantageous vantage point to observe a lane violation, is more reliable than Sgt. Kenrick." Id. at p. 7. The government asserts "Trooper Kartak's recollection of the timing of the report

could be nothing more than an innocent misrecollection of an event occurring almost a year before the testimony."   Id.

South Dakota has a "practical lane statute."   State v. Hett, 834 N.W.2d 317, 320 (S.D. 2013) (internal reference omitted).   That statute provides:

> On a roadway divided into lanes, a vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made with safety.   A violation of this section is a Class 2 misdemeanor.

S.D.C.L. § 32-26-6.   In order to justify a traffic stop, the stop "must be supported by probable cause or reasonable suspicion."   (Docket 185 at p. 8) (citing United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013)).   "A traffic stop is supported by probable cause "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law."   Id. at pp. 8-9 (citing Gordon, 741 F.3d at 876; alteration in original; internal citation omitted).   Even where a traffic stop is "a pretext for [an]other investigation" and "the traffic violation is minor," the stop is valid.   Id. at p. 9 (citing United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (referencing Whren v. United States, 517 U.S. 806, 813 (1996)).   Reasonable suspicion, which is a "less-rigorous standard" than probable cause " 'exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.' "   Id. (citing United States v. Mosley, 878 F.3d 246, 251 (8th Cir. 2017) (internal citation omitted).

"It is well-settled that the test of probable cause is *not the articulation of the policeman's subjective theory but the objective view of the facts*." United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988) (internal citation, quotation marks and brackets omitted; emphasis added). "Reasonable suspicion exists when an officer is aware of *particularized, objective facts which, taken together with rational inferences from those facts*, reasonably warrant suspicion that a crime is being committed." Id. (internal citation and quotation marks omitted; emphasis added). "The existence of reasonable suspicion involves the application of law to *facts*[.]" United States v. Robinson, 119 F.3d 663, 666 (8th Cir. 1997) (emphasis added). "In short, the government must point to specific, articulable facts that reasonably suggest a crime." United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005).

The court agrees with the magistrate judge's analysis that Sergeant Kenrick's testimony cannot be considered in a vacuum. (Docket 185 at p. 11). Trooper Kartak was stationary, waiting for the Ridgeline to travel south to the trooper's location. The trooper is very clear that the radio transmission from Sergeant Kenrick occurred sometime *before* the Ridgeline got to the crossover location. It is not just the fact that Trooper Kartak did not observe a lane violation but also the fact he vividly remembers the timing of the transmission which make the testimony irreconcilable. Because Sergeant Kenrick's testimony is inconsistent with the testimony of Trooper Kartak, which clearly contradicts Sergeant Kenrick's testimony, the court finds the sergeant's

testimony not credible.[4]   Sergeant Kenrick's testimony is not factually, objectively reasonable.

The government failed to present evidence to objectively prove that Sergeant Kenrick had probable cause or reasonable suspicion to ask Trooper Kartak to stop the Ridgeline based on the alleged lane violation.   O'Connell, 841 F.2d at 1419; Robinson, 119 F.3d at 666; Bustos-Torres, 396 F.3d at 942. The court adopts the magistrate judge's finding that Sergeant Kenrick's "conclusion that a lane violation occurred was not objectively reasonable; and therefore, the stop based on this rationale was unconstitutional."   (Docket 185 at p. 13).

The government's objections (Docket 187 ¶¶ 3 & 4) are overruled.

## 2.    THE FIRST FOLLOWING-TOO-CLOSELY VIOLATION

Trooper Kartak testified that "[r]ight as the [Ridgeline] was passing [his stationary position] it was following another vehicle too closely."   (Docket 132 at p. 112:11-13).   The trooper testified the Ridgeline "was less than three seconds behind" a dark, large SUV.   Id. at pp. 130:7-8, 13 & 15-18 and 132:4-6.   When asked the distance between the two vehicles, Trooper Kartak was unable to give "an exact distance in feet[,] [b]ut it's going to be, I would say, a

---

[4]The magistrate judge filed an amended R&R to specifically clarify that none of the testifying officers "made any intentional misrepresentations during their testimony. . . . The court simply finds that the three versions of facts . . . regarding the alleged traffic violations to be irreconcilable with each other and unreliable, and therefore, not credible."   (Docket 185 at p. 11 n.4).   The court adopts the magistrate judge's characterization of the testimony.

car length and a half." Id. at p. 131:11-12. His use of the phrase "car length" was based on "[t]he vehicle in front of the Honda. . . . Maybe the same size [as the Ridgeline]." Id. at pp. 132:17-19 and 132:6. Trooper Kartak never testified as to the Ridgeline's speed when it passed the trooper's location. See id. at pp. 107-144.

Trooper Kartak left the crossover and followed the Ridgeline south on Highway 79. The speed limit in this portion of the highway was 65 miles per hour ("m.p.h."). Id. at p. 143:22. As the trooper followed the Ridgeline, his patrol car was traveling 61 m.p.h. and was neither gaining on nor falling further behind the Ridgeline. Id. at p. 144:10-21.

Sergeant Kenrick testified as his minivan and the Ridgeline approached the area where the two troopers were in the crossover, the Ridgeline "slowed down, so [Sergeant Kenrick] had to get into the left lane to go around him." Id. at pp. 83:25-84:1. Sergeant Kenrick stated "it was right around the time we went by the troopers is when I was passing the Ridgeline." Id. at p. 85:22-24. During cross-examination, the officer testified the Ridgeline "slammed on the brakes because he saw law enforcement there, and [Sergeant Kenrick] went around him." Id. at p. 86:22-24. Sergeant Kenrick testified traffic in the area was "[i]ntermittent . . . [but he did not] recall any bunches of traffic." Id. at p. 87:1 and 12-15.

Trooper Griffith's report, when writing about the behavior of the Ridgeline as it passed the troopers in the crossover, reflects "Castro[5] hit his brakes after passing, despite being below the speed limit and no other vehicle or obstruction nearby." Id. at pp. 168:24-169:3. When asked about this statement, Trooper Griffith stated that what he meant was "there was no other traffic close by, meaning not traffic close enough that [the driver of the Ridgeline] would need to hit his brakes to avoid a collision." Id. at p. 168:12-14. Trooper Griffith was never asked if a following-too-closely violation occurred. See id. at pp. 146-183.

The magistrate judge found the testimony of both Sergeant Kenrick and Trooper Griffith irreconcilable with the testimony of Trooper Kartak. The magistrate judge concluded their testimony "renders Trooper Kartak's testimony not credible as it pertains to the first alleged violation of following too closely at the location where the Honda Ridgeline passed the parked troopers." (Docket 185 at p. 15).

The government objects to this finding. It asserts "[t]he R&R's analysis presumes the lane violation observed by Sgt. Kenrick and the following-too-closely violation observed by Trooper Kartak happened at the exact location and time, i.e., that only one of the violations could have occurred." (Docket 187 at p. 13). The government argues "Trooper Kartak testified to observing

_____

[5]It is undisputed that law enforcement did not know the name of the driver of the Ridgeline until after the traffic stop.

the following-too-closely violation just <u>before</u> the defendant passed his location. Sgt. Kenrick . . . called in the lane violation just <u>after</u> passing the troopers' location." <u>Id.</u> (emphasis in original).

South Dakota's following-too-closely statute provides:

The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and condition of the highway. A violation of this section is a Class 2 misdemeanor.

S.D.C.L. § 32-26-40.

Trooper Kartak's testimony defies logic. At one point he testified the distance between the Ridgeline and the SUV was only 1½ car lengths, yet he estimated the time between the two vehicles was less than three seconds. A Ridgeline is approximately 210 inches in length.[6] If the Ridgeline and SUV were only 1½ car lengths apart, they would be separated by only 26.25 feet.[7] If the Ridgeline was traveling 55 m.p.h., it would travel 80.6 feet per second.[8] In two seconds the vehicles' spacing would be 161.2 feet apart and at three seconds 241.8 feet apart. If the Ridgeline was traveling 60 m.p.h., it would travel 88 feet per second.[9] In two seconds the vehicles' spacing would be 176

_____

[6]See https://owners.honda.com/vehicles/information/2018/ Ridgeline/specs#mid^YK2F2JEW. Last visited January 7, 2020.

[7]210 inches x 1.5 ÷ 12 inches per foot = 26.25 feet.

[8]See https://www.calculateme.com/speed/miles-per-hour/to-feet-per-second/55. Last visited January 7, 2020.

[9]See https://www.calculateme.com/speed/miles-per-hour/to-feet-per-second/60. Last visited January 7, 2020.

feet and in three second the spacing of the vehicles would be 264 feet. None of these calculations can be reconciled with Trooper Kartak's testimony.

Trooper Kartak's subjective opinion is contradicted by Sergeant Kenrick and Trooper Griffith. There is an absence of evidence the Ridgeline was not traveling in a "reasonable and prudent" manner giving "due regard for the speed of such vehicles and the traffic upon and condition of the highway." S.D.C.L. § 32-26-40.

It must be noted Trooper Kartak did not radio the law enforcement team that he had observed this alleged following-too-closely violation. Rather, he continued to follow the Ridgeline approximately four miles before activating his patrol vehicle's light bar system which engaged the vehicle's video camera system.[10] Trooper Kartak's testimony is not factually, objectively reasonable.

The government failed to present evidence to objectively prove that Trooper Kartak had probable cause or reasonable suspicion to stop the Ridgeline based on the alleged first following-too-closely violation. O'Connell, 841 F.2d at 1419; Robinson, 119 F.3d at 666; Bustos-Torres, 396 F.3d at 942. The court adopts the magistrate judge's finding "that it was not objectively

_____

[10]According to Trooper Kartak "[o]nce you hit the switch to activate the lights . . . the video will pick up 30 seconds before when you actually hit the switch." (Docket 132 at p. 113:11-12). The court notes the vehicles traveled appropriately ½ mile after the video camera began recording and before the alleged violation at the bridge. See Exhibit 5 at 9:12:34-9:13:11. The traffic stop occurred at mile marker 68. (Docket 132 at p. 134:6-7).

reasonable to conclude that a following too closely violation occurred at the location where the Honda Ridgeline passed the parked troopers. Therefore, the stop based on this rationale is unconstitutional." (Docket 185 at p. 13).

The government's objections (Docket 187 ¶¶ 5 & 6) are overruled.

### 3.    THE SECOND FOLLOWING-TOO-CLOSELY VIOLATION

After the Ridgeline passed the immediate area of the parked patrol cars, Trooper Kartak and Trooper Griffith fell in line to follow the vehicle. (Docket 185 at p. 16). Traveling southbound behind the Ridgeline for approximately five miles, Trooper Kartak testified he observed the Ridgeline "was still following the vehicle a little too close. So [he] continued to follow the vehicle southbound[.]" (Docket 132 at p. 112:15-18). The officer stated "[t]here was a chance as I was headed southbound, and it was following [the SUV] too close." Id. at p. 116:8-10. Trooper Kartak indicated this second following-too-closely violation was captured on video. Id. at p. 116:11-13 (referencing exhibit 5). He stated, "I believe it [the violation] was right next to this bridge [shown on the video recording]." Id. at p. 116:21. He isolated the violation as occurring at about 9:13:11 on the video recording. Id. at p. 116:23-25. Even though he could not see the vehicle ahead of the Ridgeline and the SUV is not shown in the video recording, he agreed with the prosecutor that the shadow of the Ridgeline and the shadow of the vehicle in front of it confirmed the traffic violation. Id. at p. 117:1-6. Trooper Kartak acknowledged that while out on the highway he could not see the vehicle in

front of the Ridgeline but he "knew there was another vehicle in front of [the Ridgeline]. . . . [But he could] [n]ot clearly [see it]." Id. at p. 136:6-11. When asked if he could state the distance between the vehicles, the trooper answered "[n]o." Id. at pp. 136:23-137:2. His only justification for his opinion the vehicle ahead of the Ridgeline was "in close proximity" was he could not see "anything of it, just because it's too close to the Honda." Id. at p. 137:6-8. When specifically asked how far in front of the Ridgeline was the other car at 9:13:35, the officer stated "[t]wenty yards, maybe. . . . Just by guessing distance." Id. at pp. 139:25-140:4. Trooper Kartak was not monitoring the speed of the Ridgeline. Id. at p. 141:1-2. "At 9:13:54 a.m., Trooper Kartak activated his emergency light and initiated the traffic stop." (Docket 185 at p. 16) (referencing Docket 132 at p. 117:19-24; Exhibit 5).

Trooper Griffith was following behind Trooper Kartak's vehicle at an estimated distance of "50 yards or so, maybe." (Docket 132 at p. 169:11-14). By watching the video recording, Trooper Griffith guessed Trooper Kartak was "within a quarter mile of" the Ridgeline. Id. at p. 169:22-23. Trooper Griffith was unable to convert a quarter mile into feet.[11] Id. at p. 169:24-25.

From approximately 1,470 feet[12] behind the Ridgeline, Trooper Griffith "was thinking to [himself] [the Ridge is] following too close." Id. at

_____

[11]One mile = 5,280 feet ÷ 4 = 1,320 feet in a quarter mile.

[12]1320 feet + (50 yards x 3 feet) = 1,470 feet.

p. 170:15-16. However, Trooper Griffith could not articulate any objective factors which supported his subjective impression. See id. at pp. 152:11-154:25; 170:19-171:25 and 182:21-183:1. At best, the officer found the video recording from Trooper Kartak's patrol car offered a better view because "it's easier to see than when I was in my patrol car, because there was a car between me and them." Id. at p. 153:20-22. Without guessing, Trooper Kartak was unable to state the distance between the Ridgeline and the vehicle in front of it at the time of the alleged second following-too-closely violation. Id. at pp. 136:23-137:2.

The trooper's video recording provides no objective evidence to support Trooper Kartak's testimony. The road was straight and dry. Exhibit 5 at 9:13:05-9:13:13. As the Ridgeline and the two vehicles in front of it approached and crossed over the bridge where Trooper Kartak testified the violation occurred, neither of the two lead vehicles are visible. Id. According to the system in Trooper Kartak's patrol car, his vehicle, the Ridgeline and the two cars in front of it were all maintaining a speed of between 62-63 m.p.h. Id. The trooper's testimony "I know [the Ridgeline] is in close proximity [of the vehicle in front of the Ridgeline] because I can't see anything of [the vehicle in front of the Ridgeline], just because [the vehicle in front of the Ridgeline] is too close to the Honda" is not objectively reasonable. Id. at p. 137:6-8.

The government failed to present evidence to objectively prove that Trooper Kartak had probable cause or reasonable suspicion to stop the

Ridgeline based on the alleged second following-too-closely violation.

O'Connell, 841 F.2d at 1419; Robinson, 119 F.3d at 666; Bustos-Torres, 396 F.3d at 942. While the magistrate judge only made one comment about Trooper Kartak's own skepticism about the strength of his testimony, the court finds both Trooper Kartak and Trooper Griffith failed to articulate any observations which would support their subjective opinions about this alleged violation. Just because a law enforcement officer says a violation occurred does not satisfy the reasonable suspicion standard when the opinion is not supported by objective evidence. O'Connell, 841 F.2d at 1419 ("the test of probable cause is not the articulation of the policeman's subjective theory but the objective view of the facts.")

The court adopts the magistrate judge's finding that "[t]he driving conditions were excellent and there is no objective evidence to support Trooper Kartak['s] and Trooper Griffith's conclusion[s] that the Honda Ridgeline was following too closely." (Docket 185 at p. 18). The court agrees with the magistrate judge's finding the troopers' "unsupported conclusion that the Honda Ridgeline was following too closely, absent any objective supporting facts, is not factually reasonable or an objectively reasonable application of the law. Therefore, the stop based on this rationale was unconstitutional." Id. at p. 19.

The government's objections (Docket 187 ¶¶ 7-11) are overruled.

### 4. COLLECTIVE KNOWLEDGE

While the magistrate judge was never asked to evaluate the collective knowledge of Sergeant Kenrick and Trooper Kartak, the government asks the court to do so. (Docket 187 at pp. 18-19). The government argues because Sergeant Kenrick radioed he observed a traffic violation by the Honda Ridgeline, Trooper Kartak "had a 'reasonable basis for believing that the driver breached a traffic law' based on that relayed information, even if it was a mistake." Id. at p. 18 (citing Gordon, 741 F.3d at 876). The government asserts Trooper Kartak could "rely on information provided by other officers . . . to provide justification for [the] stop." Id. (citing Robinson, 119 F.3d at 666-67; referencing United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011); United States v. Thomas, 249 F.3d 725, 728 (8th Cir. 2001)).

It is undisputed Trooper Kartak did not rely on Sergeant Kenrick's radio transmission in performing the traffic stop nearly five miles later. Trooper Kartak's actions lead the court to conclude if he intended to use the information conveyed from Sergeant Kenrick, the trooper would have initiated a traffic stop shortly after the Ridgeline passed the crossover. That did not happen. Instead, Trooper Kartak followed the Ridgeline at least four miles before initiating the stop based on his subjective opinion the second following-too-closely violation had occurred. The government failed to present any evidence which would support application of the collective knowledge doctrine. Robinson, 119 F.3d at 666-67.

The government's objection (Docket 187 at pp. 18-19) is overruled.

**5.     DRUG INVESTIGATION**

Having concluded "no factually reasonable or objectively reasonable application of the traffic law permitted the warrantless stop," the magistrate judge performed an evaluation of the stop under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).   (Docket 185 at pp. 19-20).   The magistrate judge found the government presented the following evidence regarding co-defendant Cathy Well's drug trafficking activities.

> [L]aw enforcement conducted two controlled purchases of narcotics from Cathy Wells at her storage unit on Deadwood Avenue. [13] Confidential informants believed that Cathy Wells' supply of drugs was obtained from Colorado.  Law enforcement had gathered detailed information on Cathy Wells, including the following: her former and current residences, her vehicles, real time tracking of her red Tahoe, her storage unit number, and her association with suspected drug co-conspirator, Bryaunah Stewart.

<u>Id.</u> at p. 21.   All law enforcement knew about the occupants of the Ridgeline was the following:

1.     The Ridgeline "had Colorado dealer plates[.]"   <u>Id.</u> at p. 21;

2.     The Ridgeline went to the storage unit on Deadwood Avenue. <u>Id.</u>;

3.     The Ridgeline passenger "exited the vehicle carrying a red and white T-Mobile bag."   <u>Id.</u>;

---

[13]The magistrate judge concluded these purchases occurred prior to April 25, 2018, the date of the traffic stop.   (Docket 185 at p. 25).

4.    Together with the driver of the red Tahoe[14] the Ridgeline passenger entered the storage unit "and remained inside for approximately nine minutes[.]" Id.;

5.    The Ridgeline followed the Tahoe to Ms. Wells' residences in Box Elder, South Dakota, and stayed "there for a few minutes where the only activity observed was [a man] opening the hood of a white Mazda belonging to Cathy Wells[.]" Id.

6.    The Ridgeline "left [the area], filled up with gas, and headed south on Hwy 79, a common route used to travel to Colorado." Id.

The magistrate judge found law enforcement could not determine which storage unit the two people entered, "as the exterior door led to a hallway leading to multiple individual storage units." Id. at p. 22. The evidence established that the officers "did not observe any narcotics or money changing hands." Id. "Law enforcement did not know the identity of the occupants of the Honda Ridgeline. In fact, their objective in conducting the traffic stop was to identify the two male subjects." Id. The magistrate judge found:

> The only evidence offered to support the belief that the Honda Ridgeline had any connection to illegal activity, was that the vehicle had Colorado plates, the unknown occupants met with an unidentified person driving a vehicle belonging to a known narcotics trafficker (who was believed to obtain her drug supply from Colorado) at a location where prior controlled narcotics transactions were made, and the unidentified trio then spent a short period of time at Cathy Wells' residences.

---

[14]Although law enforcement did not know it was Ms. Well while viewing the live surveillance video of the Deadwood Avenue storage unit, they were able to confirm Ms. Wells as the driver of the Tahoe when the vehicle was at her Box Elder residence, before the Ridgeline was ultimately stopped. (Docket 132 at p. 24:4-6).

Id. at p. 25. Based on the evidence presented, the magistrate judge concluded law enforcement "did not have reasonable suspicion that the defendant or his passenger were engaged in criminal activity at the time when their vehicle was stopped[.]" Id. at p. 27.

The government objects to this finding by claiming the magistrate judge failed to consider other relevant conduct, namely:

1. Law enforcement observed nothing in the Ridgeline passenger's hands when he exited the Deadwood Avenue storage unit; and

2. A law enforcement tracking device indicated Ms. Wells' Tahoe was parked at a hotel the previous night.

(Docket 187 at p. 19). The government argues the fact the Tahoe was at a hotel the night before indicated Ms. Wells "could be meeting with her suppliers." Id. The government points out S.A. Palmer found the fact the Tahoe was at the hotel all night "unusual." Id. "When all this evidence is considered together, in totality," the government submits "there was reasonable suspicion to stop the [Ridgeline]." Id. at p. 20. The government believes "there are 'particularized, objective facts that lead to a rational inference that a crime' was both being committed and had been committed." Id. (citing United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008) (emphasis omitted) (quoting United States v. Hernandez-Hernandez, 327 F.3d 703, 706 (8th Cir. 2003)).

The assessment of the totality of the circumstances to "yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible." United States v. Cortez, 449 U.S. 411, 418 (1981). "First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations . . . and consideration of the modes or patterns of operation of certain kinds of lawbreakers." Id. With this information "a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." Id. The collected evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id. "The second element . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id.

There is no evidence the Ridgeline or its two occupants were at the hotel where the Tahoe was parked the night before. The fact the Tahoe, and presumedly Ms. Wells, spent the night at the hotel does not logically extend to the government's speculation she could have been meeting with her suppliers. There is no evidence a Colorado drug supplier spent the entire night with one of his or her distributors, Ms. Wells. There is no evidence which supports an officer's suspicion that some criminal conduct must be in the making at the hotel.

The government's argument the Ridgeline passenger took a red and white bag into the Deadwood Avenue storage unit but came out nine minutes later without the bag leads to an equally unconvincing inference. Even if there is an inference Ms. Wells and this man went to her storage unit to drop off drugs, there is no evidence of money exchanging hands. By S.A. Palmer's own observations, the man came out empty handed. No envelope, no satchel, no briefcase, no bag.

The court concludes as a matter of law that law enforcement could not have "reasonably suspected" the occupants of the Ridgeline "on the basis of these observed circumstances." Reid v. Georgia, 448 U.S. 438, 441 (1980). "The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." Id. The United States Court of Appeals for the Eighth Circuit cautions district courts from finding criminality based on an individual's association with an alleged drug trafficker. See United States v. Lopez-Zuniga, 909 F.3d 906, 909-10 (8th Cir. 2018), cert. denied, 139 S. Ct. 2648, 204 L. Ed. 2d 292 (2019) (The search warrant "affidavit does not connect Lopez-Zuniga to any of Garcia-Jimenez's suspected illicit activities. As the magistrate judge in this case said, if this amounts to probable cause, 'then anyone who drops a drug trafficker off at the trafficker's residence and travels

with the trafficker for innocent activity, such as the trafficker's grandmother or mere acquaintance, would be subject to search.'   We agree[.]").

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular . . . seizure in light of the particular circumstances."   Terry, 392 U.S. at 21.   "[I]n making that assessment it is imperative that the facts be judged against an objective standard . . . ."   Id.   "The existence of reasonable suspicion involves the application of law to facts[.]"   Robinson, 119 F.3d at 666.

The evidence presented by the government does not raise a reasonable suspicion the occupants of the Ridgeline were "engaged in wrongdoing." Cortez, 449 U.S. at 418.   To permit a stop of the Ridgeline under the facts of this case would violate "the central teaching of this Court's Fourth Amendment jurisprudence."   Id. (emphasis omitted) (citing Terry, 392 U.S. at 21 n.18).

The government's objections (Docket 187 ¶¶ 12 & 13) are overruled.

## 6.   DRUG DOG SWEEP

The government's last objection opposes "[t]he magistrate judge's conclusion that 'because the traffic stop was unconstitutional, the subsequent drug dog sweep is likewise unconstitutional.'"   (Docket 187 ¶ 14) (referencing Docket 185 at p. 29).   The government offers no factual argument or case authority in support of this objection.

27

The magistrate judge properly considered the criteria established in

Wong Sun v. United States, 371 U.S. 471, 487-88 (1963), to conclude that all

evidence discovered after the unconstitutional stop should be suppressed.

(Docket 185 at pp. 27-30).   But for the unconstitutional stop, "the evidence

[derived from the drug dog sweep] would not have been discovered[.]"   Id. at

p. 29.

The government failed to offer any evidence to show a valid separation

between the unconstitutional stop and the drug dog sweep.   See Brown v.

Illinois, 422 U.S. 590, 603–04 (1975) ("The Miranda[15] warnings are an

important factor, to be sure, in determining whether the confession is obtained

by exploitation of an illegal arrest.   But they are not the only factor to be

considered.   The temporal proximity of the arrest and the confession, the

presence of intervening circumstances, . . . and, particularly, the purpose and

flagrancy of the official misconduct are all relevant.") (referencing Johnson v.

Louisiana, 406 U.S. 356, 365 (1972); and Wong Sun, 371 U.S. at 491).   "And

the burden of showing admissibility rests, of course, on the prosecution."   Id.

at 604.

The court adopts the magistrate judge's analysis and conclusion "that

the taint of the Fourth Amendment violation had not been purged and all

evidence deriving from the traffic stop must be suppressed."   (Docket 185 at

_____

[15]Miranda v. Arizona, 86 S. Ct. 1602 (1966).

p. 30) (referencing <u>Wong Sun</u>, 371 U.S. at 488; <u>United States v. Guevara-Martinez</u>, 262 F.3d 751, 755-56 (8th Cir. 2001) ("We conclude that officers obtained Guevara–Martinez's fingerprints by exploiting his unlawful detention, instead of by means sufficient to have purged the taint of the initial illegality. . . . Under these circumstances, we believe that suppressing the fingerprint evidence will achieve a deterrent effect.").   All evidence derived from this unconstitutional traffic stop is suppressed.

The government's objection (Docket 187 ¶ 14) is overruled.

## ORDER

Based on the above analysis, it is

ORDERED that government's objections to the report and recommendation (Docket 187) are granted in part and denied in part consistent with this order.

IT IS FURTHER ORDERED that the report and recommendation (Docket 185) is adopted consistent with this order.

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 95) is granted.

Dated January 27, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE